**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **ABBEY RIDGE LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3: 18-CV-93-MAB** |
| | ) | |
| **ADDISON INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# <u>MEMORANDUM AND ORDER</u>

**BEATTY, Magistrate Judge:**

Pending before the Court are the following motions: Plaintiff Abbey Ridge LLC's ("Plaintiff") motion for summary judgment (Doc. 26), Defendant Addison Insurance Company's ("Defendant") motion for summary judgment (Doc. 27), Defendant's motion to strike (Doc. 31), and Plaintiff's motion in limine (Doc. 39). Both parties filed a response in opposition to the motions for summary judgment (Docs. 30 and 33). Defendant filed a reply brief to Plaintiff's response in opposition (Doc. 51). Plaintiff filed a response to the motion to strike (Doc. 36). After the pending motions were fully briefed by the parties, the Court heard oral arguments on the motions on April 4, 2019, and each of the motions were taken under advisement.

For the reasons set forth below, Plaintiff's motion for summary judgment is **GRANTED in part, DENIED in part**; Defendant's motion for summary judgment is **DENIED**; Defendant's motion to strike is **DENIED**; and, Plaintiff's motion in limine is **DENIED as moot**.

# I.  FACTUAL BACKGROUND

Plaintiff is a brewery and restaurant located in the Shawnee National Forest. Defendant insured Plaintiff's establishment through a commercial property policy of insurance (Policy number: 6041008) ("the Policy") that insured against direct physical loss to both real and personal property (Doc. 27-1). Sometime prior to May 2016, Plaintiff, acting through its managers, decided to expand its commercial footprint (Doc. 28). Terri Addison, Plaintiff's principal, elected to expand by constructing a new reception hall/event center that would serve as overflow for its bar and restaurant (Doc. 26-3, p. 5-6). On May 13, 2016, Jon Jackman of Consolidated Insurance Agency, Inc. emailed Michael Meisheid, Defendant's representative, by stating, in part, "[Plaintiff] is building on to their existing structure. I will get limits needed to you." (Doc. 28. p. 2). Mr. Jackman then emailed his colleague, Betty Wilson, on June 27 informing her, in part, that "[w]e need to initiate the builder's risk for [Plaintiff's] addition." (*Id*.). The new building/addition abutted Plaintiff's existing building with roof purlins physically attached to the existing building for aesthetics (Doc. 26-4, p. 16). The new building/addition had separate and stand-alone load bearing walls, truss system, electric, plumbing, and HVAC systems, along with its own restrooms, bar, kitchen, and exterior doorways (Doc. 26-5, p. 2-3). It also was constructed with the same height, shape, and materials as the original building (Doc. 26-5). The surface area of the new building/addition was 2,570.48 sq. ft; the surface area of the existing building was 3,221.10 sq. ft. (*Id*.).

Prior to October 2016, contractors began site preparation and concrete work necessary to erect the new building/addition (*Id.*). Erection and framing of it commenced in October 2016 and, as of November 2, 2016, contractors had framed and sheathed walls, set the trusses, installed walk-in coolers, and began installing sheet metal roofing (*Id.*). Construction on many other parts of the new building/addition had not begun including, interior doors, the bar, countertops, cabinets, shelving, plumbing system, electric system, and HVAC system (*Id.* at p. 54-73).

On December 9, 2016, Defendant commenced insuring Plaintiff under a second policy of insurance, being an inland marine policy, that provided in part, Builder's Risk coverage for the new building/addition during construction (Doc. 26-2). As of February 1, 2017, construction of Plaintiff's new building/addition was not done, as the interior finish work had not been completed (Doc 26-3, p. 8). That night, the fire loss occurred which resulted in a total loss of the existing building, the new building/addition, and the contents within both areas.

Plaintiff submitted a fire claim to Defendant, which it accepted, in part, but rejected coverage under the NACP provisions of the Policy. Specifically, Plaintiff presented a claim for damages sustained to the new building/addition in the amount of $360,948.07. Defendant paid Plaintiff $150,000 under the Builder's Risk coverage part of the inland marine policy, which left $210,948.07 in unpaid damages to the new building/addition. Plaintiff also submitted a claim for what it believed to be its newly-acquired personal property lost in the fire, which totaled $307,064.79. In a June 14, 2017 letter, Defendant denied coverage for the newly acquired business personal property in

its entirety because "the renovation being added to the existing building would not apply to that coverage. The 'Newly Acquired or Constructed Property' only applies to the construction not previously in existence." (Doc. 26-6, p. 1). The Ultra Property Plus endorsement, CP 7088, and more specifically the newly acquired or constructed property coverage extension increases the building coverage and business personal property limits to $500,000 and $250,000 respectively (*Id.*).

In a June 16 letter, Southern Illinois Public Adjusters ("SIPA"), on behalf of Plaintiff, challenged Defendant's coverage position by stating, in part, "the structure being built at the time of a fire was an entirely new building which was to be adjoined an existing building. The insured was not 'renovating' any structure. The building being constructed was at all times new construction . . .." (Doc. 26-7, p. 1-3). Additionally, the letter stated that "your company has already concluded that the insured was constructing a new building as it paid the coverage limit under the insured's Builders' Risk policy. As you are certainly aware, the Builders' Risk and Installation Coverage For, CM 70 50 02 16, only provides coverage for new construction and does not provide coverage for renovations outside of a (sic) pre-existing buildings." (*Id.* at p. 3). SIPA further contends in the letter that "in order for your company to have determined that the work being performed was new construction and not a 'renovation being added to the existing building', as it now contends." (*Id.*). Defendant argues Plaintiff's new building/addition is not covered under the building and personal property coverage form because coverage exists under the builders' risk policy (*Id.* at p. 4). The relevant policy provision provides, in part, "Covered Property does not include: k. [p]roperty that is covered under another

coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance." (*Id.*).

In a July 11, 2017 letter, Defendant reasserted its denial for coverage under the NACP provisions for the new building/addition because it contends, in part, that "[t]he addition to the main building, despite containing 'all the components of a stand-alone structure,' was in fact not a stand-alone structure. It was connected to, and depended on, the exterior wall of the existing main building; it was an addition to the main structure." (Doc. 26-8, p. 1). Additionally, in the letter, Defendant denied Plaintiff's newly acquired business personal property claim because "[the new building/addition] was not a (i) 'newly acquired location; nor was it a (ii) 'newly construction or acquired building' as addressed above. Therefore, the Newly Acquired Business Personal Property coverage extension will not apply to this loss." (*Id.* at p. 2). The relevant policy provides, in part:

> (2) Your Business Personal Property
>
> > (a) if this policy covers Your Business Personal Property, you may extend That insurance to apply to:
> >
> > > (ii) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at your newly constructed or acquired buildings at the location described in the Declarations.

(*Id.*).

Because both parties dispute what the Policy at issue provides, Plaintiff filed this lawsuit seeking declaratory relief (Count I), money damages (Count II), and statutory damages under Section 155 of the Illinois Insurance Code (Count III).

At the motion hearing regarding Defendant's motion to strike Plaintiff's experts and Plaintiff and Defendant's cross motions for summary judgment, both parties presented oral arguments, and then the Court took all pending motions under advisement.

## II.    DISCUSSION

In short, Plaintiff argues the new building/addition at issue qualifies as a new building as it relates to the Policy, therefore, the NACP provisions provide up to $500,000 in coverage for newly constructed property. Plaintiff further argues the NACP provisions also provide up to $250,000 in coverage for newly-acquired business personal property that was located within the new building/addition at the time of the loss. Conversely, Defendant argues it is entitled to summary judgment because the new building/addition was not a "new building" but rather an addition to Plaintiff's existing building at the described premises, therefore, the NACP does not provide coverage. Defendant further argues that even if the new building/addition qualified as a "new building," the specific policy provisions providing up to $500,000 in coverage for newly constructed property and up to $250,000 for newly acquired business personal property were not in force and effect at the time of the loss, having expired 90 days after commencement of construction of the new building/addition which was prior to the date of the loss. Plaintiff contends the policy provisions were in force and effect at the time of the loss as it relates to parts of the new building/addition constructed within 90 days prior to the loss because the provision at issue provides that coverage terminates "90 days after you acquire the

property or begin construction *of that part* of the building that would qualify as covered property." (Doc. 33)(emphasis in original).

Before addressing the cross motions for summary judgment and the merits of Plaintiff's underlying claims, the Court must first address Defendant's motion to strike Plaintiff's experts (Doc. 31).

## A.     Motion to Strike

On December 21, 2018, Defendant filed a motion to strike "Opinions of Plaintiff's Purported 'Experts', Kirk Freels and Dustin Freels" (*Id.*). Plaintiff then filed a response in opposition to the motion (Doc. 36). In its response, Plaintiff argues Defendant waived this argument regarding the 90-day exclusion because it failed to timely notify Plaintiff of its reliance on the exclusion (Doc. 26, p. 12-13). However, Plaintiff's waiver argument fails pursuant to the doctrine of unclean hands.

Under Illinois law, "the doctrine of unclean hands applies if a party seeking equitable relief is guilty of misconduct, fraud, or bad faith toward the party against whom relief is sought and if that misconduct is connected with the transaction at issue in the litigation." *Zahl v. Krupa*, 365 Ill. App. 3d 653, 658, 850 N.E.2d 304, 309 (2006). The unclean hands doctrine bars "only equitable remedies and does not affect legal rights." *Id.*

Specifically, Plaintiff contends Defendant should be estopped from asserting the 90-day exclusion defense for failing to timely notify Plaintiff of its reliance on it. At first glance, Plaintiff's waiver argument appears tenable. However, a review of the record indicates Plaintiff has unclean hands connected to when Defendant believed it necessary to assert the 90-day exclusion defense. Specifically, Plaintiff alleged in its complaint that

"[a]fter Thanksgiving in late November 2016, the plaintiff commenced construction of the new building." (Doc. 1, p. 3). Additionally, Philip Royster, a manager for Plaintiff, testified that work on the new/building addition started "some time after Thanksgiving." (Doc. 26-4). In contrast, Defendant contends photographs depicting a crane erecting the new building/addition initially provided by Plaintiff did not contain a date stamp. It was only *after* Defendant subpoenaed the crane company's records that it determined the erection of the new building/addition likely occurred *well before late-November 2016* making the 90-day exclusion defense more apparent to Defendant. These facts demonstrate misconduct as contemplated by the doctrine of unclean hands and Plaintiff cannot now argue that Defendant waived the 90-day exclusion defense.

Because Defendant has not waived its motion to strike, the Court must now address the merits of it. Defendant argues the Court should strike Plaintiff's experts for two reasons: (1) the experts' valuations are not ripe for determination; and, (2) the valuations are not admissible under Federal Rule of Evidence 702 and *Daubert.*

i.     **Ripeness of Valuations**

Defendant contends Plaintiff's experts' valuations are not ripe for two reasons: (1) Defendant did not have time to evaluate the experts' valuation calculation and (2) Plaintiff did not object to Defendant's contention that the experts' deposition be limited in scope to only include the issue of valuation if overall coverage was found to exist.

On November 1, two weeks before Plaintiff's valuation experts, Dustin and Kirk Freels ("the Freels") scheduled deposition and pursuant to the parties' stipulation, Plaintiff filed its expert disclosures, *either on the subject of damages or liability.* The Freels'

disclosure indicated they would render an opinion that the value of that part of the addition was constructed after November 3, 2016, *i.e.* within 90 days of the date of loss, was $189,598 which should be adjusted for inflation to $191,000. Defendant first argues the valuation is not ripe because it did not have time to evaluate the calculation. However, the Court does not find Defendant's first argument convincing as indicated below.

**a. Time for Evaluation**

First, Defendant received Plaintiff's expert disclosures two weeks prior to the Freels' scheduled deposition. If Defendant took issue with the Freels' proposed opinion because it contends "this new theory of the case was disclosed on the same day the ADDISON'S disclosure of expert witnesses was due, *thereby providing no opportunity* to ADDISON to evaluate the new damage calculation or to adequately prepare prior to the depositions of the experts or the deadline to file dispositive motions" then Defendant could have requested the deposition be reset. (Doc. 32, p. 2) (emphasis added). Defendant's contention it had *no opportunity* to address the Freels' proposed opinions is not accurate because the record indicates Defendant had two weeks to request rescheduling of the Freels' deposition. If moving the deposition conflicted with the dispositive motion deadline then Defendant could have filed a motion to continue the deadlines for discovery and dispositives. However, Defendant chose to do neither. Accordingly, Defendant's contention that the valuation is not ripe is unavailing.

**b. Scope of Freels' Deposition**

Defendant's argument as to scope fares no better. Defendant contends it conferred with Plaintiff to request the scope of the Freel's deposition be:

> [L]imited to the issue of the existence of coverage and that any discovery concerning the value of the loss be reserved to be addressed only if the requested coverage is found to exist. There was no objection to this procedure voiced by Plaintiff's counsel and the depositions of Plaintiff's experts proceed on that understanding.

*Id.* at 2-3.

In contrast, Plaintiff contends the parties did not put "any limitations" on the scope of the Freels' depositions. Clearly there was confusion among the parties regarding the scope. While there is nothing in the record to corroborate either party's specific contention, the Court finds Plaintiff's contention more plausible because it coincides with the Freels' opinion concerning the value of loss contained within their expert disclosures. It is perplexing to think Plaintiff hired an expert to render an opinion, the Freels' submitted a disclosure that included a valuation opinion, yet Plaintiff agreed to limit the Freels' deposition to address the issue of valuation *only if the requested coverage is found to exist.* We are here today because the *main issue* in this case is whether coverage existed at the time of loss. Why would Plaintiff hire experts to render a valuation opinion but then agree those opinions are beyond the scope of their experts' depositions unless coverage is found to exist? Therefore, the second argument is not convincing. The Court must now turn to Defendant's second argument related to its motion to strike.

ii.    *Daubert* **Challenge**

The Court finds the Freels' valuation opinions admissible under Federal Rule of Evidence 702 and *Daubert.* Defendant argues the Freels' valuation opinions, and the methodology employed to arrive at those values, is without basis and, therefore, the opinions should be stricken pursuant to Rule 702.

The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that the *Daubert* analysis applies to *all* expert testimony under Rule 702, not just scientific testimony). Under Rule 702 and *Daubert*, district courts have a "gatekeeping" obligation to ensure that expert testimony is both relevant and reliable. *Kumho Tire*, 526 U.S. at 147. This requires the district court to ensure the following before admitting expert testimony:

> First, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case.

*Lees v. Carthage Coll.*, 714 F.3d 516, 521–22 (7th Cir. 2013) (citing FED. R. EVID. 702 and *Smith v. Ford Motor Co.*, 215 F.3d 713, 717–19 (7th Cir. 2000)). The party offering the expert testimony bears the burden of establishing that it meets these admissibility requirements. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Defendant does not challenge the Freels' qualifications or the relevance of their

opinions. Instead, Defendant focuses on the **reliability** of the experts' opinions. "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) (quoting *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir. 2000)). In assessing the reliability of expert testimony, courts can consider the non-exhaustive list of guideposts set forth in *Daubert*: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical, or professional community. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing *Daubert,* 509 U.S. at 593–94). Additionally, the 2000 Advisory Committee's Notes to Rule 702 list additional factors for gauging expert reliability, including whether: (1) the testimony relates to matters growing naturally and directly out of research that was conducted independently from the instant litigation; (2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) the expert has adequately accounted for obvious alternative explanations; (4) the expert is being as careful as she would be in her regular professional work outside of paid litigation consulting; and (5) whether the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. *Am. Honda*, 600 F.3d at 817 (quoting FED. R. EVID. 702, Advisory Committee's Notes (2000 Amends.)).

Here, Defendant takes issue will the Freels' reliability because they "bas[e] their estimate of the value of the completed addition as of November 3, 2018 solely upon four photographs which are made part of the Freels' report." (See Doc. 36-3). Plaintiff argues

the Freels' value calculations are competent evidence making *Daubert* inapplicable.

Neither party provides the Court with any guiding precedent regarding adjusters using

photographs to determine the value of insured property subject to loss.[1]  However, in this

Court's view, it is reasonable for public adjusters to rely on photographs as a basis for a

loss estimate because many times the physical object subject to the loss is *no longer in*

*existence*. Certainly, the Freels could have done more if the property at issue was still in

existence, but Defendant has not given the Court any reason to believe that their damages

models are so patently unreliable that they are inadmissible under Rule 702 and *Daubert*.

Therefore, Defendant's motion to strike is denied.

**B.    Cross Motions for Summary Judgment**

There are five issues to consider when addressing the party's cross motions for

summary judgment: (1) whether the new building/addition qualifies as a new building

for purposes of coverage; (2) whether the Policy provides excess coverage for amounts

not covered by other insurance; (3) whether coverage under the NACP provisions

terminated 90 days after commencement of construction of the new building/addition;

(4) whether parts of the new building/addition constructed within 90 days of the loss are

covered under the NACP provisions; and, (5) if the NACP provisions were in force and

---

[1] In conducting its own research on the issue, the Court did not locate any Seventh Circuit case directly
on point. However, in *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 788 (7th Cir. 2000), the Seventh
Circuit found that "a district court did not abuse its discretion in concluding that *photographic analysis* is a
*well-accepted technique* in this area so as to bear a sufficient indicia of reliability." (emphasis added).

effect, whether that policy provides coverage for Plaintiff's business personal property contained within parts of the new building/addition.

*Motion for Summary Judgment Standard*

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial.… A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

*Legal Standard Under Illinois Law for Giving Effect to Insurance Policies*

As this is a diversity action, Illinois substantive law applies. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Clarendon Nat. Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011). Under Illinois law, insurance policies are contracts and the general rules governing the interpretation and construction of contracts govern the interpretation and construction of

insurance policies. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (2005). Illinois courts "aim to ascertain and give effect to the intention of the parties, as expressed in the policy language, so long as doing so does not contravene public policy." *Clarendon Nat. Ins. Co.*, 645 F.3d at 933 (citing *Hobbs*, 823 N.E.2d at 564). When reading the policy, courts "read the policy as a whole and consider the type of insurance purchased, the risks involved, the overall purpose of the contract." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Villicana*, 692 N.E.2d 1196, 1199 (1998)). Courts will apply the policy as written if the language is unambiguous. *Id.* (citing *Hobbs*, 823 N.E.2d at 564). Policy terms that limit an insurer's liability "are liberally construed in favor of coverage, but only when they are ambiguous, or susceptible to more than one reasonable interpretation." *Id.*; *see also Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (2007).

Terms employed in the policy which are not specifically defined will be given their plain, ordinary, and popular meanings. *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307 (2006). An insured is deemed to have read, and from that reading to understand the terms of the insurance policy which they purchased. *Am. Family Mut. Ins. Co. v. Krop*, 2018 IL 122556, ¶ 22, reh'g denied (Nov. 26, 2018). Additionally, a policy must "be construed in conjunction with endorsements in order to determine the meaning and effect of the insurance contract." *Pekin Ins. Co. v. Recurrent Training Ctr., Inc.*, 948 N.E.2d 668, 673 (2011) (citing *Vole v. Atlanta International Insurance Co.*, 526 N.E.2d 653 (1988). However, if the "provisions of a policy and an attached endorsement conflict, the terms and conditions of the endorsement control and supersede the conflicting policy provisions." *Id.* (citing *Tribune Co. v. Allstate Insurance Co.*, 715 N.E.2d 263 (1999)).

An insured must show a claim is within the coverage provided by a policy to recover under the policy. *Waste Mgmt., Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322, 333 (1991). "Once the insured has demonstrated coverage, the burden then shifts to the insurer to prove that a limitation or exclusion applies." *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (2009). With all the above in mind, the Court first considers whether the new building/addition qualified as a new building for purposes of coverage under the Policy.

### i. New Building/Addition

The Court finds the new building/addition qualifies as a "newly constructed or acquired building" for purposes of coverage under the Policy. As previously outlined, under Illinois law, if the words "used in the insurance policy are reasonably susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy. This is especially true with respect to provisions that limit or exclude coverage." *Rich*, 875 N.E.2d at 1090 (citations omitted). "A court will consider only reasonable interpretations of the policy language and will not strain to find an ambiguity where none exists." *Id.*

Here, the Court finds both parties present reasonable interpretations of the Policy language. The relevant provision at issue provides, in part:

(2) Your Business Personal Property

(a) if this policy covers Your Business Personal Property, you may extend That insurance to apply to:

(ii) Business personal property, including such property that you newly acquire, located at your *newly constructed or acquired buildings* at your *newly constructed or acquired buildings* at the location described in the Declarations.

(Doc. 26-8, p. 2) (emphasis added). Plaintiff argues the new building qualifies as such because it had separate and stand-alone load bearing walls, truss system, electric, plumbing, and HVAC systems, along with its own restrooms, bar, kitchen, and exterior doorways. It also was constructed with the same height, shape, and materials as the original building. Meanwhile, Defendant contends the new building was actually an addition to Plaintiff's existing structure, therefore, the Policy does not provide coverage. Defendant argues the new building is an addition because "[t]he addition to the main building, despite containing 'all the components of a stand-alone structure,' was in fact not a stand-alone structure. It was connected to, and depended on, the exterior wall of the existing main building; it was an addition to the main structure." (Doc. 26-8, p. 1).

The Court agrees with Plaintiff's contentions and analysis as to why this is a new building rather than an addition. Defendant focused on, among other things, the fact that the new building abutted the existing structure with roof purlins physically attached to the existing building. However, Plaintiff correctly contends (and Defendant fails to dispute) that the roof purlins were for aesthetics only and did not provide any structural support for the new building. Because the provision at issue is written to limit Defendant's coverage commitments and because both parties present reasonable interpretations making the provisional language ambiguous, the Court must construe it against Defendant and in favor of Plaintiff. As such, the new building qualifies as a "newly constructed or acquired building" for purposes of coverage under the Policy. The

Court will next address the issue of whether the Policy provides excess coverage for amounts not covered by other insurance.

**ii.     Excess Coverage**

The $210,948.07, as excess, is covered under the NACP provisions under the Ultra Property Plus endorsement. The issue is whether the $210,948.07 in excess not covered by the builders' risk policy is covered under the NACP provisions under the Ultra Property Plus endorsement. Illinois courts will apply the policy as written if the language is unambiguous. *Hobbs*, 823 N.E.2d at 564. Here, the relevant policy provision provides:

2. Property Not Covered

   Covered Property does not include:

      k.     Property that is covered under another coverage form of this or any other policy in which it is more specifically described, *except for the excess of the amount due (whether you can collect on it or not) from that other insurance.*

(Doc. 26-7, p. 4) (emphasis added).

Defendant contends Plaintiff's new building is not covered under the NACP provisions because coverage exists under the builders' risk policy. Defendant reasons that because it paid Plaintiff the new building's replacement cost (subject to a $150,000) under the builders' risk policy provision k excludes coverage. However, this argument is unavailing because it fails to consider *the exception contained within provision k*. The plain language of the provision provides an exception to the exclusion. Specifically, the provision provides, "except for *the excess* of the amount due (whether you can collect on it or not) from that other insurance." (emphasis added). There is no dispute Defendant

provided Plaintiff coverage under the builders' risk policy by valuing the new building's replacement cost at $360,948.07. However, this valuation under the builders' risk policy was subject to a limit of $150,000 leaving an excess of $210,948.07 which then implicates provision k's excess exception. Therefore, the $210,948.07, as excess, is covered under the NACP provisions under the Ultra Property Plus endorsement. The Court will next consider whether coverage under the NACP provisions terminated 90 days after commencement of construction of the new building or provides coverage for part of the building constructed within 90 days of the loss.

### iii.      90 Day Period

Because both parties present reasonable interpretations of the "90-day" window language and that language is written to limit Defendant's coverage commitments, the language must be construed against Defendant. Defendant argues the NACP provisions were not in effect at the time of loss because the loss occurred more than 90 days after commencement of the new building. Defendant reasons the 90-day limitation is reasonable because the NACP provisions act as stop-gap insurance for the new building until the insured purchases permanent insurance for the covered property. Plaintiff argues the NACP provisions were in effect at the time of loss to cover *parts of the new building* constructed within 90 days of the loss. The relevant policy provides that coverage for the new building terminates "90 days after you acquire the property *or* being construction *of that part of the building* that would qualify as covered property." (Emphasis added). Neither party provided the Court with guiding precedent regarding cases

involving NACP provisions.[2] To support its position that the 90-day window began running at the commencement of construction of the new building, Defendant cites to a case from California's Fourth Circuit Court of Appeals. In *S. Kornreich & Sons, Inc. v. Genesis Ins. Co.*, the court found the NACP provided only temporary coverage to the covered property for 90 days from acquisition of the property because the policy unambiguously specifies coverage "will end under the extension of temporary coverage when any of the following first occurs: (a) the policy expires; (b) *90 days expire after acquisition of the property* . . . ." 56 Cal. App. 4th 407, 414 (1997) (emphasis added). In arriving at its decision, the court focused on the plain language of the policy and the sound business practice of providing stop-gap insurance. The court also considered relevant precedent. *Id.* at 407 ("In interpreting insurance policies, courts should give the policy its plain and ordinary meaning. (*Reserve Ins. Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].").

Here, the Policy at issue is easily distinguishable from the policy in *S. Kornreich & Sons, Inc.* because the plain language of the NACP provision includes the unambiguous language "of that part of the building." Defendant interprets "part" to mean the "integral structural components, or 'parts' of the building were up and completed more than 90 days before 90 days before the loss," but that is not what the plain language unambiguously conveys (Doc. 28, p. 16). While that may be a reasonable interpretation, it is also equally reasonable (and in fact more reasonable) to interpret the added language

---

[2] The Court briefly researched the issue but did not discover any Seventh Circuit case law regarding interpreting NACP provisions.

Page 20 of 25

as 90-day stop-gap insurance for *that part of the building* being constructed. Therefore, because both parties present reasonable interpretations of the 90-day window language, and that language is written to limit Defendant's coverage commitment, the language is construed against Defendant resulting in the NACP provisions being in force and effect at the time of loss. The next issue is whether the NACP provision includes a coverage extension for newly acquired business personal property located at the new building.

**iv.    Business Personal Property**

The issue now becomes whether the business personal property extension provides an additional $250,000 of coverage for Plaintiff's business personal property contained within the new building at the time of loss. Similar to the previous analysis, Plaintiff presents a reasonable interpretation of business personal property coverage extension, however, Defendant failed to rebut that interpretation. Because the coverage extension language is written to limit Defendant's coverage commitments and Plaintiff presented a reasonable interpretation of how the extension applies to Plaintiff's newly acquired business personal property, the language must be construed against Defendant.

The relevant newly acquired business personal property coverage extension provides:

    5.    Coverage Extensions

        Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol is shown in the Declarations, you may extend the insurance provided as follows:

(2)     Your Business Personal Property

(a) If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

(ii) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

(Doc. 26-6, p. 1)

Plaintiff argues that "[b]y virtue of the property plus endorsement, this newly acquired personal property coverage extension provides an additional $250,000.00 of business personal property coverage." (*Id.*). Defendant argues Plaintiff's newly acquired business personal property does not fall within the scope of coverage because Plaintiff was not constructing a "new building" under the terms of the Policy. As previously determined, Plaintiff's property subject to loss qualifies as a new building under the terms of the Policy. Additionally, Defendant does not directly dispute Plaintiff's claimed business personal property does not fall within the scope of the coverage extension. Rather, Defendant argues again that the NACP provisions were not in force and effect at the time of loss. However, as previously determined, said provisions were in effect at the time of loss. Further, Defendant does not dispute Plaintiff's lost property damage calculation of $307,064.79. Therefore, Plaintiff is entitled to the full $250,000 extension coverage for newly acquired business personal property under the Policy.

**v.      Section 155 Damages**

The final issue the Court must address is whether Plaintiff is entitled to damages under Section 155 of the Illinois Insurance Code. The narrow question is whether an insurer's conduct is "vexatious and unreasonable." 215 ILCS 5/155. Here, Defendant's conduct does *not* warrant damages under Section 155.

Illinois courts have established a totality of the circumstances test to determine whether an insurer's conduct was "vexatious and unreasonable" by setting out a number of factors. *Golden Rule Ins. Co. v. Schwartz*, 203 Ill. 2d 456 (2003). These factors include: (1) Knowingly misrepresenting relevant facts or policy provisions; (2) Settling a claim for less than it is worth; (3) Forcing an insured to litigate to obtain his or her benefits; (4) Failing to properly investigate a claim or basing a denial on improper investigative grounds; (5) The attitude of the insurer; and, (6) Whether the insured was deprived of use of its property for any length of time. Whether an insurer's conduct is vexatious and unreasonable is a matter committed to the trial court's discretion. *McGee v. State Farm Fire & Cas. Co.*, 315 Ill. App. 3d 673, 681 (2000).

Here, a review of the totality of the circumstances shows Defendant's conduct does not warrant damages under Section 155. First, Defendant provided reasonable interpretations of the Policy provisions. Second, a delay in settling a claim does not violate Section 155 if the delay results from a *bona fide* dispute regarding coverage. *Id.* at 681. There was a clear *bona fide* dispute as evidenced by both parties' reasonable interpretations of the relevant Policy provisions. Defendant's conduct regarding

Plaintiff's claim does not rise to the level "vexatious and unreasonable" when there is a clear *bona fide* dispute. Therefore, Plaintiff is not entitled to damages under Section 155.

### III.  <u>CONCLUSION</u>

Defendant's motion to strike is denied for the reasons previously stated. Regarding the cross-motions for summary judgment, Plaintiff's property subject to loss qualifies as a **new building** under the terms of the Policy; the **$210,948.07**, as excess, is covered under the Ultra Property Plus endorsement; the NACP provisions were in force and effect at the time of loss; Plaintiff is entitled to the full **$250,000** extension for newly acquired business personal property under the Policy. However, Plaintiff is **not entitled** to damages under Section 155.

Accordingly, Defendant's motion to strike (Doc. 31) is **DENIED**; Defendant's motion for summary judgment (Doc. 27) is **DENIED**; Plaintiff's motion for summary judgment (Doc. 26) is **GRANTED in part**, **DENIED in part**; and, Plaintiff's motion in limine (Doc. 39) is **DENIED as MOOT**.

Plaintiff's damages are **$460,948.07**. In accordance with Federal Rule of Procedure 58(a), judgment for this matter will be entered on a separate document. In the complaint, Plaintiff seeks an amount in excess of $460,948.07, plus pre-judgment interests, costs of suit, and for all other relief this Court deems just and proper under the circumstances, but the Parties' motions for summary judgment are silent on these issues. Before the Court can enter judgment, the parties must brief these issues.

Plaintiff is therefore **DIRECTED** to brief the above issues regarding pre-judgment interests, costs of suit, and all other proper relief on or before **September 25, 2019**. Once

Plaintiff files its brief, Defendant is **DIRECTED** to respond to Plaintiff's brief within 7 days of its filing.

**IT IS SO ORDERED.**

**DATED:   September 18, 2019**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**